**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FFR SE, LLC | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO.  14-5439 |
| SEAN SANBORN, et al | : | |

## MEMORANDUM

KEARNEY, J.                                                                                      JUNE 30, 2015

Succeeding in a new business requires managing expectations while balancing several initiatives. Promises, often included in written contracts, are the bedrock of any business plan. When encountering difficulty, you may look to the negotiated contracts and possibly other persons who, with the benefit of hindsight, you now wish did not cross your path.   Such is the nature of the human dynamic risk in any new business. When disappointed, parties often invoke the valuable but costly lever known as commercial litigation.  Using this lever in federal courts requires putting aside personal animus leading to broad impermissible allegations and instead pursuing specific claims recognized at law in the proper forum.   Here, in its third costly attempt to plead a claim, a disappointed contracted distributor of roofing products again broadly overstates its claims for failure to receive product it allegedly purchased in 2013, sues a party over whom this Court lacks jurisdiction and ignores its promise to arbitrate.    In the accompanying Order, we: grant Defendant Jay Sanborn's motion to dismiss for lack of personal jurisdiction; grant Defendant Tony Ring's motion to dismiss the conversion and unjust enrichment claims against him; direct Plaintiff to forthwith seek recovery from Defendants Polarhyde Distribution Corporation and Sean Sanborn in the agreed arbitration forum; and, pending arbitration and the possible raising of all claims there, stay the remaining claims against

Defendants Tony Ring (to a limited extent) and claims against Fielco LLC and Fielco Industries, Inc. arising from their conduct but not under an alleged joint venture, agency or "acting in concert" theory.

## I.  FACTS ALLEGED IN SECOND AMENDED COMPLAINT

This case involves the alleged failure of a Florida company to deliver a certain roofing product to one of its exclusive distributors, a South Carolina company.  The nexus to this Court is the Defendant Pennsylvania company manufactures and sells the roofing product to the Defendant Florida company who, in turn, sells it to the South Carolina Plaintiff under an exclusive distribution agreement.  After three attempts at a complaint, we understand at least one pled allegation subject to several defenses: the South Carolina company never received two-thirds of roofing product it ordered in February 2013 from the Florida company.  This contractual breach will be resolved exactly where the parties agreed; an American Arbitration Association ("AAA") arbitration in Florida.

Non-parties Douglas Delaney ("Delaney") and James Brady ("Brady") formed South Carolina Plaintiff FFR SE LLC ("FFR") in August 2011 to distribute allegedly unique roofing material bought and promoted by Defendant Polarhyde Distribution Corporation, a Florida company ("Polarhyde") owned and run by Floridian Sean Sanborn, a college mate of Delaney. (ECF Doc. No. 45, Second Am. Compl. ("SAC"), ¶¶ 1, 5, 7, 31, 32-34.)  Sean Sanborn's brother, Defendant Jay Sanborn, is a Kentucky resident allegedly providing technology services to Polarhyde, including website assistance. (*Id.* ¶¶ 6, 19.)  Polarhyde purchases and then sells this K-1 roofing material manufactured by Pennsylvania companies Defendants Fielco LLC and Fielco Industries, Inc. ("Fielco") through exclusive distributors. (*Id.* ¶¶ 2-3, 7, 37.)   Defendant

Tony Ring ("Ring") promoted Fielco's products. [1] (*Id.* ¶ 4, 16.)

*2011 formation of FFR and $10,000 purchase of product*.

In July 2011, Sean Sanborn began soliciting his college mate Delaney to become a Polarhyde exclusive distributor of the K-1 product. (*Id.* ¶ 32.) Sean Sanborn allegedly misrepresented the "K-1 product, the K-1 business, including sourcing, supply, performance, and return on investment." (*Id.* ¶ 34.) Delaney and Brady claim Sean Sanborn's July 2011 representations "induced [them] to form" FFR and sign an August 23, 2011 exclusive distribution agreement with Polarhyde ("August 2011 EDA"). (*Id.*) The August 2011 EDA required mandatory arbitration in Florida of "any dispute arising out of this Agreement or with respect to the interpretation of any provision hereof". (ECF Doc. No. 50, Polarhyde Memo., p. 11.) FFR does not plausibly or specifically allege Ring or Fielco induced it to sign the August 2011 EDA. *See e.g.* SAC ¶ 34.

In September 2011, FFR bought 100 gallons of K-1 for $10,000. (*Id.* ¶ 57.) FFR, in its third attempt, still has not pled where it sent this money, but makes no claim for failure of this delivery or product defect.

Almost two months after signing the August 2011 EDA and a month after buying $10,000 of K-1, FFR, through Delaney and Brady, attended an October 2011 seminar in West Palm Beach, Florida, during which the Sanborn brothers and Ring solicited persons to become Polarhyde exclusive distributors of the K-1 product. (SAC ¶ 35.) The Sanborns and Ring spoke about marketing and selling K-1, the sales support for distributors, as well as K-1's composition and favorable environmental impacts. (*Id.*) Sean Sanborn misrepresented the "status of certain

---

[1]    Like many of FFR's broad allegations, we cannot discern Ring's relationship with Fielco. FFR broadly refers to Fielco LLC and Fielco Industries, Inc. as "the Fielco Defendants" and does not include Ring in that definition.

large, national accounts and larger jobs" Polarhyde had already contracted, thus giving a certain appeal to becoming an exclusive distributor. (*Id.* ¶ 43.) Jay Sanborn misrepresented "the number of customer and sales representative leads" Polarhyde's electronic referral system could produce. (*Id.* ¶¶ 45-46.) Sean Sanborn also misrepresented K-1's origin story through marketing materials approved by Polarhyde and Fielco. (*Id.* ¶ 47.) Further, Polarhyde and Fielco approved marketing materials misrepresenting K-1's shelf life. (*Id.* ¶ 48.) Sean Sanborn also misrepresented FFR's payments would be used to subject K-1 to industry testing beneficial to sales efforts. (*Id.* ¶ 52.) FFR claims this industry testing never took place. (*Id.*)

Although it already signed the August 2011 EDA months earlier, FFR alleges it relied on these October 2011 misrepresentations when purchasing K-1 product in February 2013.

### FFR's 2013 purchases of K-1 from Polarhyde.

FFR's next alleged interaction is in February 2013 when it ordered 500 gallons of K-1 on February 8, 2013 and wired $40,000 to "Defendants." (*Id.* ¶¶ 81-82.) For unknown reasons, FFR then signed a second EDA on February 11, 2013 which includes the identical arbitration provision. ("February 2013 EDA") (*Id.* ¶ 78.) On February 12 and 13, 2013, FFR ordered 2,500 gallons of K-1 and wired $200,000 to "Defendants." (*Id.* ¶¶ 83-84.)[2] Sean Sanborn said someone sent this FFR payment to Fielco. (*Id.* ¶ 85.)

After those purchases, FFR traveled to see its product. In March 2013, FFR's Brady met with Sean Sanborn and Ring at Fielco's Pennsylvania manufacturing plant. (*Id* ¶ 16.) While at the plant, Sean Sanborn and Ring showed FFR's K-1 product inventory it had allegedly purchased and over which it had exclusive control. (*Id.*) Brady confirmed the existence of 1,500

---

[2]     FFR inconsistently alleges it spent $240,000 on K-1 as "Ordered Inventory" omitting the $10,000 it allegedly spent in September 2011. *Compare* SAC ¶ 57 and ¶ 86. As FFR never claims any loss from the September 2011 purchase, we interpret its third attempt at pleading a claim as conceding no loss from this first transaction.

of the 3,000 total gallons ordered by FFR and took a picture of the ordered inventory. (*Id.* ¶¶ 90-93.) A day later, FFR's Brady and Sean Sanborn traveled to Bensalem, Pennsylvania where Sanborn repeated his representations regarding the K-1 product's performance. (*Id.* ¶ 17.)

FFR's Brady traveled to Philadelphia in September 2013 to attend an industry expo with Sean Sanborn. (*Id.* ¶ 18.) Sean Sanborn again repeated the same representations he made at the October 2011 seminar. (*Id.*) These March and September 2013 representations, of course, did not induce any purchases.[3]

By mid-November 2013, FFR had only received one-third of its February 2013 orders and the delivered K-1 product contained a different batch number than shown to Brady on his March 2013 visit. (*Id.* ¶¶ 99, 101-02.) FFR describes the limited K-1 product received as "stale, and …partially solidified." (*Id.* ¶ 102.)

## II. DISCUSSION

In this third attempt at pleading a viable complaint, FFR alleges "Defendants" violated the Lanham Act, 15 U.S.C. § 1125(a)(1) (Count I) and engaged in: unfair competition under Pennsylvania law (Count II); conversion (Count III); fraudulent misrepresentation (Count IV); negligent misrepresentation (Count V); unjust enrichment (Count VI); and, fraudulent inducement (Count VII). These claims challenge Polarhyde's failure to deliver K-1 product under either the August 2011 or February 2013 EDA and are subject to the agreed arbitration in Florida. In this agreed forum, the parties can promptly resolve the anticipated parol evidence and gist of the action challenges to FFR's tort and unfair competition claims and the role, if any,

---

[3]    FFR pleads a wide variety of "misrepresentations" made by "Defendants" generally and at unknown times and places concerning warranties, K-1 product composition, marketing materials, and Fielco's shipping capabilities. (*Id.* ¶¶ 53-76.)

played by the other Defendants in this failure to deliver.[4]

In exercising our discretion to stay this matter, pending the arbitration, and place it in this Court's suspense docket, we must first address Defendants' challenges to this Court's jurisdiction over the case and the non-Pennsylvania defendants and then whether FFR states a claim.

## A. This Court has subject matter jurisdiction.

Fielco argues FFR fails to sufficiently aver the citizenship of each member of Fielco LLC thus possibly depriving this Court of diversity jurisdiction.[5]  FFR admits its omission but argues LLC membership is not a matter of public record in Pennsylvania.   LLC citizenship is determined by the citizenship of its members.  *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010).  FFR fails to properly allege the citizenship of Fielco LLC.   FFR does not meet its obligation to plead diversity jurisdiction.

Notwithstanding the apparent, but not confirmed, lack of diversity jurisdiction, this Court exercises subject matter jurisdiction under its supplemental jurisdiction authority pursuant to 28 U.S.C. § 1367.  "[A] district court may exercise supplemental jurisdiction where state-law claims share a 'common nucleus of operative fact' with the claims that supported the district court's original jurisdiction."  *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 307-08 (3d Cir. 2003) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).  Section 1367(a) provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise
> by Federal statute, in any civil action of which the district courts have original
> jurisdiction, the district courts shall have supplemental jurisdiction over all other

---

[4]     Defendants curiously did not raise parol evidence or gist of the action in this Court but may do so in the Florida arbitration or upon lifting of the stay in this Court if not addressed before the Florida arbitrator assigned by the AAA.

[5]     Fielco does not argue diversity jurisdiction is absent.  Rather, they only argue FFR fails to *plead* diversity.

claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).

Subsection (c) provides:

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

This Court has original jurisdiction pursuant to 32 U.S.C. § 1331 under the Lanham Act plead in Count I. We find none of the exceptions in subsection (c) apply at this stage and deny Fielco's motion for lack of subject matter jurisdiction mindful we are ever vigilant in ensuring subject matter jurisdiction.[6]

**B. This Court may exercise personal jurisdiction over Sean Sanborn but not his brother Jay Sanborn.**

Polarhyde argues this Court lacks personal jurisdiction over Sean Sanborn and Jay Sanborn as they do not have sufficient minimum contacts with Pennsylvania.[7]

---

[6]      Dismissal of the federal question under the Lanham Act and on the present factual record would accordingly alter our analysis. The parties elected not to address *Lexmark v. Static Control,* ___U.S.___, 134 S.Ct. 1377 (2014).

[7]      When a defendant raises the defense of personal jurisdiction, the plaintiff bears the

A federal court may exercise personal jurisdiction "according to the law of the state where it sits." *O'Connor v. Sandy Lane Hotel, Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007). "First, the court must apply the relevant long-arm statute to see if it permits the exercise of personal jurisdiction; then the court must apply the precepts of the Due Process Clause of the Constitution." *IMO Indus., Inc v. Kiekart AG*, 155 F.3d 254, 259 (3d Cir. 1998). Pennsylvania's long arm statute provides that it reaches to the "fullest extent allowed under the Constitution of the United States." 42 Pa. Cons. Stat. § 5322(b). "A district court's exercise of personal jurisdiction pursuant to Pennsylvania's long arm statute is therefore valid as long as it is constitutional." *Pennzoil Prods Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197 (3d Cir. 1998) (citing *Farino*, 960 F.2d at 1221).

Personal jurisdiction manifests itself in two distinct categories: general jurisdiction and specific jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 & n.9 (1984). General jurisdiction is based upon the defendant's "continuous and systematic contacts" with the forum. *General Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir.2001) (citing *Helicopteros*, 466 U.S. at 414-416). Specific jurisdiction is appropriate only if the "plaintiff's cause of action arises out of a defendant's forum-related activities, such that the defendant 'should reasonably expect being haled into court' in that forum." *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 151 (3d Cir. 1996) (quoting *Worldwide*

---

burden of a *prima facie* showing of appropriate jurisdiction. *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)). Plaintiff must establish "with reasonable particularity sufficient contacts between the defendant and the forum state." *Mellon Bank (East) PSFS, National Association v. Farino*, 960 F.2d 1217, 1221 (3d Cir.1992) (citation omitted). A "plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales*, 384 F.3d at 97 (citing *Pinker*, 292 F.3d at 368). Plaintiff, however, must support its allegations with affidavits or other competent evidence. *See Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996).

*Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

FFR concedes the Sanborns are not subject to general jurisdiction and as such, we need only address whether this Court may exercise specific jurisdiction over the Sanborns.[8] *O'Connor*, 496 F.3d at 317. FFR argues the Sanborns purposely availed themselves of the right to do business in Pennsylvania and FFR's legal injuries arise out of or are related to this purposeful availment.

Whether the exercise of specific jurisdiction is proper requires a three part inquiry. *Id.* "First, the defendant must have purposefully directed [its] activities at the forum. Second, the litigation must arise out of or relate to at least one of those activities. And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comport[s] with fair play and substantial justice." *Id.* (internal citations and quotations omitted). While personal jurisdiction is generally a claim-specific and defendant-specific analysis, where certain claims are "factually overlapping," separate analysis may not be necessary. *Id.* at 318 n.3 (citing *Remick v. Manfredy*, 238 F.3d 248, 255-56 (3d. Cir 2001)).

### *Claims against Sean Sanborn.*

The Court may properly exercise specific jurisdiction over claims against Sean Sanborn for fraudulent and negligent misrepresentation, fraudulent inducement, violation of the Lanham Act, and Pennsylvania unfair competition.[9] FFR specifically alleges Sean Sanborn arranged for Brady to travel to Pennsylvania for a March 2013 meeting, wherein Sean Sanborn made misrepresentations concerning the K-1 product, its performance, and the arrangement for new distributors. (SAC ¶¶16-17.) FFR alleges Sean Sanborn invited Brady to travel to Philadelphia

---

[8]     Polarhyde does not challenge this Court's exercise of personal jurisdiction over it.

[9]     We analyze these "factually overlapping" claims together. *See Id.*

to attend an October 2013 trade show with him. (*Id.* ¶ 18.) At this trade show, Sean Sanborn allegedly made material misrepresentations consistent with those he had made in the October 2011 seminar in Florida. (*Id.*) Sean Sanborn made these representations to Brady and the public attending the Philadelphia trade show. (*Id.*) These misrepresentations included not only verbal misrepresentations but written ones as well, including in marketing materials. (*Id.*) Polarhyde's motion does not challenge these allegations other than misstating the "sole allegation" supporting Sean Sanborn's minimum contacts with Pennsylvania is the trade show visit. We find given Sean Sanborn making the alleged misrepresentations in Pennsylvania to Brady, he availed himself of "the privilege of acting within Pennsylvania" such that he reasonably could have anticipated litigating these claims in Pennsylvania. *Gehling v. St. George's School of Medicine*, 773 F.2d 539, 544 (3d Cir. 1985) (finding personal jurisdiction over defendant who made material misrepresentation to plaintiff in forum); *Leone v. Cataldo*, 574 F. Supp. 2d 471, 480 (E.D. Pa. 2008) (same); *Toussant v. Williams*, 62 F. Supp. 3d 417 (E.D. Pa. 2014) (finding purposeful availment when defendant made misrepresentations over phone to Pennsylvania resident).

We may also exercise specific personal jurisdiction over Sean Sanborn on the conversion and unjust enrichment claims. Specific jurisdiction focuses on the relationship between "the defendant, the forum, and the litigation." *Pinker*, 292 F.3d at 368. FFR alleges Sean Sanborn, along with Fielco, converted the "Ordered Inventory" located in a Fielco warehouse in Huntingdon Valley, Pennsylvania. (SAC ¶¶ 120-24.) FFR specifically alleges Sean Sanborn and Tony Ring told Brady in the Fielco Pennsylvania warehouse that FFR had control over the specific "Ordered Inventory" shown to him there. (*Id.* ¶¶ 90-93, 95.) When FFR attempted to exercise control over its "Ordered Inventory," Sean Sanborn and Fielco failed to deliver it as

promised and gave it to other distributors. We find a "meaningful link" between Sean Sanborn's activities conducted in the forum with a forum resident (Fielco) and the substance of FFR's conversion claim. *O'Connor*, 496 F.3d at 324.

Similarly, we find specific jurisdiction over the unjust enrichment claim against Sean Sanborn. FFR alleges it "conferred the benefit of money and time expended to become a distributor of K-1" on Defendants. (SAC ¶ 139.) In large part, FFR alleges it did so because of Sean Sanborn's conduct and relationship with Pennsylvania.[10]

Having found Sean Sanborn is subject to this Court's specific personal jurisdiction, we now determine whether exercising jurisdiction over him comports with "traditional notions of fair play and substantial justice." *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft, Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). We generally address four factors: 1) burden on the defendant; 2) forum State's interest in adjudicating the dispute; 3) plaintiff's interest in obtaining the most efficient resolution of

---

[10]  Sean Sanborn's corporate contacts with Pennsylvania may also be considered in exercising personal jurisdiction. "Generally, individuals performing acts in a state in their corporate capacity are not subject to the personal jurisdiction of the courts of that state for those acts. However, a recognized exception to this general rule is that a corporate agent may be held personally liable for torts committed in their corporate capacity. The courts recognizing this exception allow personal jurisdiction in such circumstances so the corporate defendant will not be able to use a corporate shield to protect himself from suit in the forum." *Elbeco Inc. v. Estrella de Plato, Corp.*, 989 F. Supp. 669, 676 (E.D. Pa. 1997) (internal citations and quotations omitted); *see also Mendelsohn, Drucker & Assocs. v. Titan Atlas Mfg., Inc.*, 885 F. Supp. 2d 767, 785 (E.D. Pa. 2012) (finding personal jurisdiction over chief executive officer for participation in torts alleged). A court examines "the officer's role in the corporate structure, the quality of the officer's contacts, and the extent and nature of the officer's participation in the alleged tortious conduct." *Maleski v. DP Realty Trust*, 653 A.2d 54, 63 (Pa. Commw. Ct. 1994).

Given these factors, we find Sean Sanborn is subject to this Court's personal jurisdiction. He is Polarhyde's owner and president and thus "a key player in the corporate structure." *Rittenhouse & Lee v. Dollars & Sense, Inc.*, No. 83-5996, 1987 WL 9665, *5 (E.D. Pa. Apr. 15, 1987); *Gentex Corp. v. Abbott*, 978 F. Supp. 2d 391, 402-04 (M.D. Pa. 2013). He made many of the alleged misrepresentations forming the basis of FFR's tort claims in Pennsylvania on more than one occasion. He has quality contacts and directly participated in the tortious conduct.

controversies; and, 4) the shared interest of the several States in furthering fundamental substantive social policies." *Miller Yacht Sales, Inc.*, 384 F.3d at 97 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

Pennsylvania has a strong interest in deterring actors from committing torts within its territory. *See Sullick v. United Pet Grp., Inc.*, No. 14-2950, 2015 WL 3643988, *8 (E.D. Pa. June 12, 2015). Further, the burden on Sean Sanborn litigating in Pennsylvania is not unnoticed by the Court, but allowing him to reap the benefit of conducting business in Pennsylvania "while leaving an injured plaintiff remediless is "fundamentally unjust." *Merced v. Gemstar Grp., Inc.*, No. 10-3054, 2011 WL 5865964, * 5 (E.D. Pa. Nov. 22, 2011). Sean Sanborn presents no evidence to support a showing of unfairness. He has failed to meet his burden of presenting a "compelling case" jurisdiction is unreasonable. *O'Connor*, 496 F.3d at 324.

### *Claims against Jay Sanborn.*

In contrast, we cannot exercise specific personal jurisdiction over Jay Sanborn. FFR alleges Jay Sanborn's minimum contacts arise from possessing "exclusive control over the electronic lead generation system and commercially interactive website." FFR alleges Jay Sanborn misrepresented Polarhyde's electronic referral system available to distributors at the Philadelphia trade show in October 2013. (SAC ¶ 19.) FFR further alleges Jay Sanborn also misrepresented the electronic referral system available to distributors and the customer testimonials at the October 2011 seminar in Florida. ( *Id.* ¶¶ 45-46.)

As we examined whether Sean Sanborn's corporate contacts may be used to exercise personal jurisdiction over him individually, we now do so as to Jay Sanborn. We find we may not exercise specific personal jurisdiction over Jay Sanborn. Jay Sanborn's Declaration states, with the exception of two business trips required by a former employer, he has not traveled to or

through Pennsylvania in the last fourteen (14) years. (Polarhyde Defs.' Mem., Ex. 5, ¶ 7.) Plaintiff offers no rebuttal but instead chooses to rely on the SAC allegations, which is insufficient to establish a *prima facie* case of personal jurisdiction in the face of a challenge by a defendant. *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 (3d Cir. 1984).

We find exercising personal jurisdiction over Jay Sanborn is improper. Jay Sanborn is not a Polarhyde employee let alone a "key player in the corporate structure." *Rittenhouse & Lee*, 1987 WL 9665, *5. Jay Sanborn's contacts with Pennsylvania are not quality contacts, nor does his alleged participation in the tortious acts strike the Court as extensive or significant in Pennsylvania.

FFR also argues specific personal jurisdiction over Jay Sanborn is appropriate because he operates Polarhyde's "commercially interactive" website and directs Polarhyde's website to Pennsylvania residents. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1123-24 9W.D. Pa. 1997). However, FFR fails to adduce evidence to show where the website falls on the *Zippo* sliding scale. On one end of the scale are "passive" websites which merely "make information available on the internet." *Spuglio v. Cabaret Lounge*, 344 F. App'x 724, 726 (3d Cir. 2009) (citing *Zippo*, 952 F. Supp at 1124). On the other end of the spectrum are "active" websites controlled by defendants who "enter[] into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the internet." *Id.* Moreover, there is a middle ground between "active" and "passive" websites. *Id.* at n.2. In those cases, "the proper exercise of personal jurisdiction 'is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.' " *Id.* (quoting *Zippo*, 952 F. Supp. at 1124).

FFR presents no evidence regarding material characteristics of Polarhyde's website

allegedly operated by Jay Sanborn. On first blush, we are not aware of authority finding specific jurisdiction over a non-employee website consultant working on another party's website. Further, absent any evidence offered by FFR, we cannot determine whether Polarhyde's website qualifies as "active," "passive," or somewhere in the middle. Given this deficiency, we find the exercise of personal jurisdiction over Jay Sanborn to be improper and he is dismissed.[11]

### C. FFR does not state a claim tying Fielco and Ring to Polarhyde's alleged tortious misconduct.

FFR sues Fielco and Ring, as part of its "all defendants" tact, seeking damages arising from alleged misrepresentations or other conduct of Sean Sanborn and Polarhyde. While Fielco may be responsible for possible direct misrepresentations of its alleged agent Ring, FFR's present (third) complaint fails to plead sufficient facts to demonstrate joint venture, agency or acting in concert relationship between Fielco and Ring on one hand and Polarhyde on the other. As such, we grant Fielco and Ring's motion to dismiss any claim they could be liable for Polarhyde's or Sean Sanborn's conduct.[12] FFR and Ring remain potentially liable, subject to

---

[11]    Even if the website were "active," which we cannot determine, FFR failed to show Pennsylvania residents actually used the website in an active manner. *See Ackourey v. Sonellas Custom Tailoring*, 573 F. App'x 208, 213 (3d Cir. 2014) ("[Plaintiff] has failed to provide any evidence that Pennsylvania residents used Defendants' website to schedule appointments.") In fact, Sean Sanborn's declaration states: "Polarhyde does not have any exclusive distributor for Pennsylvania, nor has it ever had a distributor in that territory." (Polarhyde Defs.' Mem., Ex. 4, ¶ 9.) Further, "Polarhyde does not sell any products, directly or indirectly, including but not limited to roof coating products, in Pennsylvania." (*Id.* ¶ 10.) FFR offers no evidence to the contrary. *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir. 2003) (finding *Zippo* requires "evidence that the defendant purposefully availed itself of conducting activity in the forum state, by directly targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts").

[12]    A Rule 12(b)(6) motion examines the complaint's sufficiency. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), which gives the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " Bell *Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). A

discovery, for any of their own conduct.

Pennsylvania defines a joint venture as an "association of persons or corporations who by contract, express, or implied, agree to engage in a common enterprise for their mutual profit." *Corporate Aviation Concepts, Inc. v. Multi-Service Aviation Corp.*, No. 03-3020, 2004 WL 1900001, *6 (E.D. Pa. Aug. 25, 2004) (citation omitted). The elements of a joint venture are:

1. Contribution to the joint venture by each member, which can be services, skills, knowledge, materials, or money;
2. Sharing of profits among the parties;
3. A joint proprietary interest and right of mutual control over the subject matter of the enterprise; and
4. Usually, a single business transaction rather than a general and continuous transaction.

*McRoberts v. Phelps*, 138 A.2d 439, 443-44 (Pa. 1958).

A "[j]oint venture is an amorphous legal doctrine" and we are not to interpret these factors too strictly when determining whether a joint venture exists. *Streamline Business Servs., LLC v. Vidible, Inc.*, No. 14-1433, 2015 WL 3477675, *3 (E.D. Pa. June 2, 2015) (quoting *Beavers v. West Penn Power Co.*, 436 F.2d 869, 872 (3d Cir. 1971)). Even given this unexacting requirement, we find FFR has not alleged facts showing a sharing of profits, a joint proprietary interest and a single business transaction. To the contrary, FFR's broadly pled allegations confirm Fielco is a separate manufacturer with its own business selling its K-1 product to Polarhyde which, in turn, sells it to exclusive distributors such as FFR. We do not find joint marketing efforts designed to improve both of their sales revenues to equal anything close to a

---

court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). We will dismiss a complaint if the factual allegations in the complaint are not sufficient " 'to raise a right to relief above the speculative level.' " *West Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 169 (3d Cir. 2013) (quoting *Twombly*, 550 U.S. at 555).

joint venture. Under FFR's reasoning, any manufacturer such as Microsoft could be considered to be in a "joint venture" with a distributor or retailer such as Target because they arguably share profits and contribute different talents to obtain the profits. After three attempts, FFR cannot plead the nexus between Polarhyde and Fielco/Ring.

Fielco and Ring are not liable for Polarhyde's conduct based on agency. "An agency relationship can be established in four ways: (1) express authority; (2) implied authority, to do all that is proper, usual and necessary to the exercise of the authority actually granted; (3) apparent authority, as where the principal holds one out as agent by words or conduct; and (4) agency by estoppel." *Garczynski v. Countrywide Home Loans, Inc.*, 656 F. Supp. 2d 505, 511 (E.D. Pa. 2009) (internal quotations omitted). FFR alleges no facts supporting an agency relationship between Sean Sanborn and Fielco. It does not allege Fielco exerted any control over Sean Sanborn or employed him. *Id.* FFR's conclusory allegations of an agency relationship are not sufficient. *Id.* Thus, to the extent FFR is attempting to impose liability under an agency theory, Fielco's and Ring's motion is granted. Similarly, we find insufficient factual allegations to state a claim Polarhyde and Fielco acted in concert.

### D. FFR states conversion and unjust enrichment claims against Fielco but not Ring.

Fielco and Ring argue FFR failed to state a conversion claim as against them. (ECF Doc. No. 49, Fielco Defs.' Mem., 17.) " 'Under Pennsylvania law, conversion is the deprivation of another's right of property, or use of a chattel, or other interference therewith, without the owner's consent and without legal justification.' " *Fenton v. Balick*, 821 F. Supp. 2d 755, 760 (E.D. Pa. 2011) (quoting *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995) (internal quotations omitted)). There are several ways in which a conversion can occur: "1) acquiring possession of property with the intent to assert a right to it

adverse to the owner; 2) transferring the property therefore depriving the owner of control; 3) unreasonably withholding possession of the property from one who has the right to it; and 4) misusing or seriously damaging the property in defiance of the owner's rights." *Id.*

Construing the factual allegations as true, we find FFR alleges sufficient facts to state a conversion claim against Fielco. FFR alleges it had a right to the property being held at Fielco's Pennsylvania warehouse. (SAC ¶ ¶120, 122). FFR alleges Fielco distributed FFR's "Ordered Inventory" to other distributors. Given these factual allegations, we find FFR sufficiently states a conversion claim against Fielco.

After three attempts, however, FFR still cannot plead Ring converted anything, let alone had the authority to do so. Fielco or Polarhyde had the ability to convert "Ordered Inventory" and satisfy other customers' needs. FFR does not allege Ring did anything relating to the missing "Ordered Inventory." As such, FFR fails to state a conversion claim against him.

For similar reasons, FFR states a claim Fielco may be unjustly enriched by having FFR as a distributor but has not plead any fact supporting a claim Ring is unjustly enriched by either receipt of money or any benefit. FFR repeatedly, and presumably tactically, refuses to plead a fact it knows: who it paid for the K-1 product in August 2011 and February 2013. FFR admits Sean Sanborn advised the $240,000 in payments "were received by [Polarhyde]," but then alleges "upon information and belief" FFR's money posted to both Sean Sanborn's and Fielco Defendants' account. (*Id.* ¶¶ 87, 89). FFR's broad factual assertions will be tested in discovery mindful of its, and counsel's, obligations under Fed.R.Civ.P. 11. After three attempts, however, FFR is unable to identify any benefit to Ring, FFR's unjust enrichment claim against Ring is dismissed.

**E. FFR's claims against Polarhyde and Sean Sanborn are subject to a valid arbitration provision requiring arbitration in West Palm Beach, Florida.**

In August 2011, just weeks before its first order of K-1 product, and in February 2013, contemporaneous with its $240,000 in purchases of K-1 product, FFR signed exclusive distribution agreements where it agreed, "any dispute arising out of this Agreement or with respect to the interpretation of any provision hereof shall be decided finally by arbitration held in West Palm Beach, Florida in accordance with the rules of the American Arbitration Association applicable to commercial arbitrations… [t]he agreement to arbitrate shall be specifically enforceable in a court of competent jurisdiction… [t]he prevailing party in any litigation relating to this Agreement, including Arbitration, shall be entitled to all reasonable attorneys' fees and costs…"

FFR ignores its agreement and has now filed three complaints in this Court against Polarhyde and Sean Sanborn concerning the failure to deliver product under their exclusive distribution agreements. FFR agreed this Court, having exercised subject matter jurisdiction and personal jurisdiction over FFR, Polarhyde and Sean Sanborn, may now specifically enforce the parties' benefit of the bargain.

Polarhyde and Sean Sanborn move to compel arbitration. The Court of Appeals for the Third Circuit recently clarified the standard of review used in deciding a motion to compel arbitration. *See Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 774 (3d Cir. 2013). "[W]here the affirmative defense of arbitrability of claims is apparent on the face of a complaint (or documents relied upon in the complaint) . . . the FAA would favor resolving a motion to compel arbitration under a motion to dismiss standard without the inherit delay of discovery." *Id.* at 773-74. Yet, the 12(b)(6) standard is inappropriate where "the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to

establish on its face that the parties agreed to arbitrate, or the opposing party has come forth with reliable evidence that is more than a naked assertion that it did not intend to be bound by the arbitration agreement." *Id.* at 774. FFR as not presented any evidence, let alone a naked assertion, it did not intend to be bound by the arbitration agreement at issue. Further, FFR's complaint references the EDA (which the Polarhyde Defendants attach to their motion) confirming it forms the basis of the parties' relationship.[13] (SAC, 1; ¶¶ 78, 147.) We will thus evaluate the motion under the 12(b)(6) standard.[14]

This arbitrability dispute is governed by the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"). "Congress designed the FAA to overrule the judiciary's reluctance to enforce agreements to arbitrate and its refusal to put such agreements on the same footing as other contracts, and in the FAA expressed a strong federal policy in favor of resolving disputes through arbitration." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009) (internal citations omitted). Whether a party is compelled to arbitration requires a two-step inquiry: 1) there must be a valid agreement to arbitrate; and 2) the dispute at issue falls within the scope of the arbitration provision. *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). As neither party contests the validity of the arbitration clause

---

[13] FFR does not differentiate between the August 2011 EDA and the February 2013 EDA, simply referring to "the EDA." FFR does not dispute the validity of either EDA. Polarhyde attached both EDAs to its motion to dismiss, and both contain identical arbitration provisions. Because we may consider "undisputedly authentic document[s]" attached to a defendant's motion to dismiss, we will consider both the August 2011 EDA and the February 2013 EDA in deciding the motion to dismiss. *Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

[14] In their respective briefing, both parties apply the 12(b)(6) standard to the arbitration issue. Further, neither party requests discovery to determine whether they actually reached an agreement to arbitrate. FFR does not challenge the validity of the arbitration agreement at all. Instead, it argues the claims do not fall within the scope of the arbitration provision. We find "further development of the factual record" is unnecessary to decide the motion, and the Rule 56 standard is inapposite. *Guidotti*, 716 F.3d at 774-75.

contained in Article 19 of the EDA, we will focus only on whether FFR's claims fall within the scope of said provision and apply federal law. *Century Indem. Co.*, 584 F.3d at 524 (determination of whether dispute falls within scope of arbitration provision is "a matter of federal law").

In determining whether a particular dispute falls within the scope of a given arbitration provision, there is a "presumption in favor of arbitrability." *Trippe Mfg. Co.*, 401 F.3d at 532. As such, the court will resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983); *see also CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014). This presumption is especially applicable where the arbitration provision is broad in scope. *See AT&T Techs., Inc. v. Comms. Workers of Am.*, 475 U.S. 643, 650 (1986) (citation omitted); *Battaglia v. McKendry*, 233 F.3d 720, 725 (3d Cir. 2000). A motion to compel arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Yet, a court must be careful not to compel a party to arbitrate claims which it did not contract to arbitrate. *See CardioNet*, 751 F.3d at 172-73 (observing "the duty to arbitrate remains one assumed by contract"). To aid in this undertaking, the court must carefully " 'focus [ ] on the factual underpinnings of the claim rather than the legal theory alleged in the complaint.' " *Id.* at 173 (quoting *Medtronic AVE Inc. v. Advanced Cardiovascular Sys., Inc.*, 274 F.3d 44, 55 (3d Cir. 2001)).

Here, the EDA compels arbitration of "any dispute arising out of this Agreement or with respect to the interpretation of any provision hereof." (ECF Doc. No. 50, Polarhyde Defs.' Mem., 11.) Our Court of Appeals has found provisions with the phrases "arising under" and "'arising out of' "are normally given broad construction, and are generally construed to

encompass claims going to the formation of the underlying agreement." *Battaglia*, 233 F.3d at 727; *Griswold v. Coventry First LLC*, 762 F.3d 264, 272 n.5 (3d Cir. 2014); *Renfrew Ctrs., Inc. v. UNI/CARE Sys. Inc.*, 920 F. Supp. 2d 572, 574 (E.D. Pa. 2013).[15] Given our Court of Appeals' precedent in construing similar provisions broadly, as well as the fact that the parties chose not to include limiting language in the arbitration provision, we will thus interpret the arbitration provision at issue broadly.

### *Fraudulent Inducement, Misrepresentation, and Negligent Misrepresentation Claims.*

We find FFR's fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation claims are arbitrable. In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406 (1967), the Supreme Court found an arbitration provision using the "arising out of" language sufficiently broad to encompass claims of fraudulent inducement. The Court noted, however, "if the claim is fraud in the inducement of the arbitration clause itself . . . the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Prima Paint*, 388 U.S. at 403-04. Here, FFR does not argue, and we do not interpret FFR to be challenging, the inducement of the arbitration clause specifically, but rather the contract as whole. Given the EDA's broad arbitration provision, the presumption in favor of arbitrability, as well as the *Prima Paint* rule, we find the fraudulent inducement claim is subject to arbitration. *See Renfrew*, 920 F. Supp. 2d at 576 (subjecting fraudulent inducement claim to arbitration); *see also Fox Int'l Relations v. Fiserv Secs., Inc.*, 418 F. Supp. 2d 718, 724 (E.D. Pa. 2006) (compelling arbitration

---

[15]     FFR's Opposition cites *Granite Rock Co. v. Int'l Bhd. Of Teamsters,* 561 U.S. 287 (2010). We do not find this citation to be instructive on whether the arbitration provision at issue is broad or narrow in scope. The Court, in a parenthetical, only notes a comparison to an extremely broad arbitration provision. *Granite Rock*, 561 U.S. at 307. This comparison does not invalidate our Court of Appeals' broad interpretation of arbitration provisions using language such as "arising out of."

of fraud *in factum* claim challenging validity of entire contract).

The *Prima Paint* rule is not limited solely to fraudulent inducement claims. *See Fox Int'l Relations*, 418 F.Supp. 2d at 722-23. FFR's claims of fraudulent and negligent misrepresentation do not necessarily raise issues of contract interpretation or performance. However, the court looks to the "factual underpinnings" of a claim rather than the legal theory so as to " 'prevent[] a creative and artful pleader from drafting around an otherwise applicable arbitration clause.' " *CardioNet*, 751 F.3d at 173 (citing *Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1198 (10th Cir. 2009)).

The "factual underpinnings" of FFR's misrepresentation claims are essentially the same as the fraudulent inducement claim. FFR alleges Defendants "held themselves out as the inventors, manufacturers, exclusive distributors, and sales and marketing for a unique roofing product . . . ." (ECF Doc. No. 45, SAC, 1.) These representations induced FFR to sign the EDA and pay over $200,000 for the K-1 roofing product which Defendants did not completely deliver and which did not meet the standards promised by Defendants. (*Id.* at 1-2.) Further, FFR alleges Polarhyde and Sean Sanborn made misrepresentations, consistent with those underlying FFR's fraudulent inducement claim, throughout their commercial relationship. (*Id.* ¶ 43.) Polarhyde's and Sean Sanborn's misrepresentations allegedly induced FFR to continue marketing and distributing the K-1 product under the August 2011 EDA. Moreover, the continuing misrepresentations between the August 2011 EDA and the February 2013 EDA allegedly induced FFR to enter into the February 2013 EDA and pay $240,000 in new K-1 product orders in February 2013. (*Id.* ¶ 78.) The facts in FFR's fraudulent inducement claim are the same as those supporting its misrepresentation claims, have their "genesis" in the EDA as they relate to the EDA's subject matter and require us to compel arbitration of these claims. *Sweet Dreams*

*Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 643 (7th Cir. 1993) (compelling arbitration of fraud and misrepresentation claims having "genesis in the Agreement"). In addition, nothing in the arbitration provision suggests with "positive assurance that the arbitration clause is susceptible of an interpretation" that places these tortious acts outside of the scope of the arbitration clause. *Century Indem. Co.*, 584 F.3d at 524.

### *Lanham Act and Pennsylvania Unfair Competition Claims.*

We further find FFR's Lanham Act and Pennsylvania Unfair Competition claims are subject to the EDA's arbitration provision.[16] Again, the parties agreed to a very broad arbitration provision. In addition, they failed to include any limiting language specifically excluding Lanham Act or unfair competition claims from arbitration. *Oyler v. Fin. Independence and Res. Educ.*, No. 07-982, 2008 WL 275729, *5 (M.D. Pa. Jan. 30, 2008). In *Oyler*, the court compelled arbitration of a Lanham Act claim relating to false statements made regarding services provided by the defendant. *Id.* The court found that because the alleged false promotional statements underlying the plaintiff's Lanham Act claim "led directly to the formation of the contract" it could not say with positive assurance that the claim fell outside the scope of the agreement. *Id.* (citing cases around country compelling arbitration of Lanham Act claims under broad arbitration provisions). We find FFR's Lanham Act and Pennsylvania unfair competition claims fall within the scope the broad arbitration provision. The "factual underpinnings" of these claims are the same as the fraudulent inducement and misrepresentation claims. The alleged false advertising and promotion underlying the Lanham Act and unfair competition claims induced FFR to enter into the EDA and continue to conduct business with the Polarhyde Defendants in accordance with the EDA. Thus, we find that these claims can be said to have "arise[n] out of"

---

[16]      FFR's Lanham Act and Unfair Competition claims are basically the same.

the EDA and are arbitrable.

### Conversion and Unjust Enrichment Claims.

Finally, we find FFR's conversion and unjust enrichment claims are subject to arbitration. Unjust enrichment and conversion claims are arbitrable so long as they "touch matters covered by the parties' agreement." *Bannett v. Hankin*, 331 F. Supp. 2d 354, 361 n.8 (E.D. Pa. 2004) (quotations omitted). Here, these claims relate to the underlying agreement. FFR alleges it "conferred the benefit of money and time expended to become a distributor of K-1 on Defendants," which it did by entering into the EDA. (ECF Doc. No. 45, SAC, ¶ 139.) FFR alleges its "inventory purchase allowed Defendants to sell Plaintiff's inventory at a profit to other entities." (*Id.* ¶ 140.) FFR allegedly paid Defendants over $240,000 for "Ordered Inventory" and did not receive the total product ordered. (*Id.* ¶¶ 120-24.) These allegations all relate to the conduct of the parties, which is substantially governed by the EDA. These claims relate to the subject matter of the EDA, and are arbitrable.[17]

---

[17] FFR does not address whether Sean Sanborn, a non-signatory, can compel arbitration of the claims against him and we thus find FFR to have conceded this argument. Even if FFR had addressed this issue, we find Sean Sanborn may invoke the arbitration clause. "A non-signatory cannot be bound to arbitrate unless it is bound under traditional principles of contract and agency law to be akin to a signatory of the underlying agreement." *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001). In *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1115 (3d Cir. 1993), our Court of Appeals stated, "[b]ecause a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements." 7 F.3d at 1121. "The *Pritzker* rule—that non-signatory agents may invoke a valid arbitration agreement entered into by their principal—is well-settled . . . ." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 224 (3d Cir. 2007); *Winner v. Etkin & Co., Inc.*, No. 07-903, 2008 WL 554981, *2 (W.D. Pa. Feb. 28, 2008) (noting *Pritzker* rule allows non-signatories to invoke arbitration but cannot be used to *force* nonsignatories into arbitration). Here, Sean Sanborn, by joining in Polarhyde's motion to compel arbitration, invokes the valid arbitration provision entered into by Polarhyde and we find the claims against him subject to arbitration. As we already found no allegation of agency or joint venture between Polarhyde and

**B. Stay pending arbitration.**

Section 3 of the FAA eliminates this Court's discretion to dismiss a case when one of the parties applies for a stay litigation pending arbitration. 9 U.S.C. § 3; *Lloyd v. HOVENSA LLC,* 369 F.3d 263, 269 (3d Cir. 2004). While Polarhyde seeks complete dismissal, FFR requests the litigation be stayed pending arbitration. (ECF Doc. No. 51, Pl.'s Resp., 9.) Therefore, we will stay the litigation pending arbitration under the EDA's Article 19. We extend this stay to the remaining claims against Fielco and Ring as "intertwined" with the factual and legal issues against Polarhyde and Sean Sanborn. *See Brandl v. Ace USA*, No. 10-03512, 2011 WL 129422, *6 (E.D. Pa. Jan. 14, 2011) (citing *Moses H. Cone*, 460 U.S. at 21 n.23 ("in some cases, of course, it may be advisable to stay litigation among nonarbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket.")).

**C. The award of attorneys' fees is not warranted at this juncture.**

We decline to award attorneys' fees under the EDA as premature at this stage and deny Polarhyde's motion in that regard. *See Apollo Metals, Ltd. v. Electroplating Techs., Ltd.*, No. 06-5245, 2009 WL 4043305, *6 n.5 (E.D. Pa. Nov. 23, 2009) (denying attorneys' fees to party who successfully compelled arbitration because party did not "receive at least some relief on the merits").

**II. CONCLUSION**

We find FFR has not properly pled diversity as it fails to allege the citizenship of Fielco

---

Fielco/Ring, Fielco and Ring cannot be compelled to arbitrate but may wish to do so for purposes of cost containment and final resolution.

LLC's members, leaving this Court unable to determine diversity. Nonetheless, this Court presently exercises supplemental jurisdiction over FFR's common law claims based on the Lanham Act claim. This Court may exercise specific personal jurisdiction over Sean Sanborn on all claims, but may not exercise specific jurisdiction over Jay Sanborn on any claim. Accordingly, Jay Sanborn is dismissed. In addition, we find all of FFR's claims against Polarhyde and Sean Sanborn are subject to binding arbitration in accordance with Article 19 of the parties' August 2011 and February 2013 EDA.

FFR has not pled joint venture, agency or acting in concert liability upon Fielco or Ring for Polarhyde's or Sean Sanborn's conduct. FFR stated claims against Fielco for direct liability and, possibly, arising from any misrepresentation of Ring. FFR has not stated a claim against Ring for conversion or unjust enrichment and those claims are dismissed against him. The remaining claims against Polarhyde, Sean Sanborn, Fielco and Ring are stayed and this matter placed in the Court's suspense docket pending resolution of the arbitration.